**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANNITA RIVERA and<br>MAURICIO ANTONIO RIVERA CASTILLO,<br><br>Plaintiffs,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State; and UNITED STATES DEPARTMENT OF STATE,<br><br>Defendants. | Case No. 1:26-cv-11422<br><br>VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>(Administrative Procedure Act,<br>5 U.S.C. §§ 701–706)<br><br>(Jury Trial Not Demanded) |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Annita Rivera and Mauricio Antonio Rivera Castillo bring this action through their undersigned counsel against Defendant Marco Rubio, in his official capacity as Secretary of State, and Defendant United States Department of State (together, "Defendants" or the "State Department"). Plaintiffs allege as follows:

## INTRODUCTION

Mauricio Antonio Rivera Castillo did everything the United States government told him to do. He has lived in the Chicago area for more than twenty-two years. He married Plaintiff Annita Rivera, a United States citizen born in Chicago, in 2013. Together they are raising their ten-year-old United States citizen son, who has autism and receives special-education services. Together they own and run an auto-repair business in Stone Park, Illinois. U.S. Citizenship and Immigration Services ("USCIS") approved Annita's Form I-130 petition for Mauricio in 2017 and approved his Form I-601A provisional unlawful presence waiver in 2025. The National Visa Center ("NVC") found his case documentarily qualified in December 2025 and scheduled his immigrant visa interview at the U.S. Embassy in San Salvador, El Salvador.

A provisional waiver takes effect only after the applicant leaves the United States and appears for his consular interview, so Mauricio had to depart. He departed on August 11, 2026, under a grant of voluntary departure that the Chicago Immigration Court entered that morning. He relied on the interview appointment that the State Department itself set. The Embassy rescheduled that interview for Wednesday, September 16, 2026, at 7:30 a.m. Mauricio appeared at the Embassy at the appointed time with every document the government asked for. Embassy personnel turned him away. They told him that the Embassy is not conducting immigrant visa interviews because the State Department has "paused" them and that he must wait for an e-mail with a new date. They gave him no date. No consular officer has looked at his application.

What happened to Mauricio is not a scheduling mishap. It is the product of a worldwide directive (the "Pause") that the State Department began implementing on August 24, 2026. That was the first business day after the United States District Court for the Southern District of New York vacated the Secretary of State's nationality-based ban on immigrant visas for 75 countries. That court held that the Secretary has no authority to dictate the outcome of consular visa adjudications. *Catholic Legal Immigration Network, Inc. v. Rubio*, No. 1:26-cv-00858 (JAV), ECF Nos. 83, 84 (S.D.N.Y. Aug. 21 & 24, 2026) ("*CLINIC*"). Within days, embassies and consulates around the world began cancelling scheduled immigrant visa interviews and sending applicants form e-mails stating that their appointments had been "rescheduled," with no new date. The cancellations reached posts (including San Salvador) that serve nationals of countries never subject to the vacated policy. The State Department has since admitted under oath that it "rescheduled immigrant visa appointments globally through August 31, 2026" and had "undertaken additional rescheduling of immigrant visa appointments globally through September 2026." It says it did so "to account for updated procedures for consular officers applying the public charge ground of

inadmissibility" and "[t]o accommodate a global training initiative." It admits that "[t]here is no fixed date" for completion. On September 14, 2026, the Department told the *CLINIC* court that it wants to prevent immigrant visa applications from "proceed[ing] to visa issuance and admission before the Department completes the updated public-charge training and adjudication tools." It asserts an authority "to not admit aliens on visas who may become public charges until the Department can implement improved procedures to evaluate those aliens."

Congress did not give the Secretary of State that power. Congress commands that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b). It withholds from the Secretary "those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas." 8 U.S.C. § 1104(a). It requires every agency to conclude matters presented to it "within a reasonable time." 5 U.S.C. § 555(b). The State Department's own regulations provide that an immigrant visa applicant "shall be required to appear personally before a consular officer for the execution of the application" and "must be interviewed by a consular officer." 22 C.F.R. § 42.62(a)–(b). Once the applicant executes the application, "the consular officer must issue the visa [or] refuse the visa." 22 C.F.R. § 42.81(a). The Department's Foreign Affairs Manual is blunt: an officer "cannot temporarily refuse, suspend, or hold the visa for future action." 9 FAM 504.1-3(g). The Pause replaces those commands with an open-ended, worldwide suspension of the adjudication process that Congress never authorized. The Department adopted the Pause without any reasoned explanation. It gave no consideration to applicants who had already left the United States in reliance on scheduled appointments and who cannot return without a visa. The circumstances show that the Pause is a means of continuing to withhold immigrant visas after a federal court vacated the policy that previously did so.

Plaintiffs do not ask this Court to review any consular officer's decision or to order the issuance of a visa. No consular officer has made any decision in Mauricio's case. That is the problem. Plaintiffs ask for three things. The Court should enjoin Defendants from applying the Pause to Mauricio. It should require Defendants to give him the interview they scheduled and then took away. And it should require Defendants to adjudicate his application under the standards that Congress and the State Department's own regulations set. Judge Rowland of this Court granted materially similar relief against a State Department directive earlier this year. The Department issued the visa within days. *Leon Morales v. Rubio*, No. 1:26-cv-02893, ECF Nos. 47, 48 (N.D. Ill. May 18 & 27, 2026).

**JURISDICTION AND VENUE**

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States. Those laws include the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* This action seeks relief other than money damages, so the United States has waived sovereign immunity. 5 U.S.C. § 702.

2. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive and interim relief under 5 U.S.C. §§ 705 and 706 and Federal Rule of Civil Procedure 65.

3. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C). Defendants are an officer and an agency of the United States sued in their official capacities. This action involves no real property. Plaintiff Annita Rivera resides in this District at 3300 Butterfield Road, Bellwood, Illinois 60104. Plaintiff Mauricio Antonio Rivera Castillo resided at that address with his wife and

son for many years until he departed for his consular interview in August 2026. His domicile remains there, and he intends to return there when he receives his immigrant visa.

4. Assignment to the Eastern Division is proper under Local Rule 40.1 because Plaintiffs reside in Cook County, Illinois.

**PARTIES**

5. Plaintiff Annita Rivera is a United States citizen by birth. She was born in Chicago, Illinois, in 1990, and she resides at 3300 Butterfield Road, Bellwood, Illinois 60104. She is Mauricio's wife. She is the petitioner on the approved Form I-130, Petition for Alien Relative, filed for him, and she is the sponsor who executed a Form I-864, Affidavit of Support, for his immigrant visa application. She flew to El Salvador on August 12, 2026, the day after Mauricio departed, to be with him for his interview. She has made one trip back to the United States since then. She returned to El Salvador shortly thereafter and she is in El Salvador now.

6. Plaintiff Mauricio Antonio Rivera Castillo is a citizen of El Salvador. He was born in Usulután, El Salvador, in 1986. He is the beneficiary of the approved Form I-130 that his wife filed, and he is the applicant for an immediate-relative (IR1) immigrant visa (NVC Case No. SNS2017623011, Alien Registration No. A097-735-937). He lived in the Chicago area continuously from January 2004 until August 11, 2026. He has been in El Salvador continuously since that day, awaiting the immigrant visa interview that Defendants scheduled and then refused to hold. He cannot lawfully return to the United States.

7. Defendant Marco Rubio is the Secretary of State of the United States. Plaintiffs sue him in his official capacity. The Secretary administers and enforces the immigration laws relating to the powers, duties, and functions of diplomatic and consular officers, except for those powers, duties, and functions conferred upon consular officers relating to the granting or refusal of visas.

8 U.S.C. § 1104(a). The Secretary is responsible for the policies and directives of the State Department, including the Pause.

8. Defendant United States Department of State is an executive agency of the United States within the meaning of 5 U.S.C. § 551(1). It schedules immigrant visa interviews and adjudicates immigrant visa applications through its Bureau of Consular Affairs, the National Visa Center, and U.S. embassies and consulates abroad (including the U.S. Embassy in San Salvador). The State Department issued the Pause and is implementing it.

## STATUTORY AND REGULATORY BACKGROUND

### A. The Immediate-Relative Immigrant Visa Process

9. The spouse of a United States citizen is an "immediate relative" and is not subject to numerical limitations. An immigrant visa is therefore immediately available once USCIS approves the citizen's Form I-130 petition. 8 U.S.C. §§ 1151(b)(2)(A)(i), 1154(a)(1)(A)(i).

10. After USCIS approves the petition, it transfers the case to the NVC. The NVC collects the applicant's Form DS-260 immigrant visa application, his civil documents, and the petitioner's Form I-864 Affidavit of Support. The NVC then determines that the case is "documentarily qualified" and schedules an interview at the consular post with jurisdiction. See 22 C.F.R. §§ 42.61–42.67. Appointments "are generally scheduled in the chronological order of the documentarily complete applicants." 9 FAM 504.1-2(d)(1).

11. The applicant "shall be required to appear personally before a consular officer for the execution of the application," and "must be interviewed by a consular officer who shall determine on the basis of the applicant's representations and the visa application and other relevant documentation… [t]he applicant's eligibility to receive a visa." 22 C.F.R. § 42.62(a)–(b). The

applicant must also undergo a medical examination by a panel physician whom the Embassy designates. 22 C.F.R. § 42.66.

12. Congress directs that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b). Once an immigrant visa application "has been properly completed and executed before a consular officer… [who] must issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa." 22 C.F.R. § 42.81(a). A visa "can be refused only upon a ground specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6. The Foreign Affairs Manual instructs consular officers: "Once an application has been executed, you must either issue the visa or refuse it. You cannot temporarily refuse, suspend, or hold the visa for future action." 9 FAM 504.1-3(g).

13. Congress vests the authority to grant or refuse visas in consular officers. 8 U.S.C. § 1201(a)(1). Congress expressly withholds from the Secretary of State "those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas." 8 U.S.C. § 1104(a).

**B. The Public Charge Ground and the Affidavit of Support**

14. A noncitizen is inadmissible if, "in the opinion of the consular officer at the time of application for a visa," he or she "is likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A). In making that determination the consular officer "shall at a minimum consider the alien's (I) age; (II) health; (III) family status; (IV) assets, resources, and financial status; and (V) education and skills," and "may also consider any affidavit of support under section 1183a." *Id.* § 1182(a)(4)(B).

15. A family-based immigrant must have a sponsor who executes a legally enforceable Form I-864, Affidavit of Support. In it, the sponsor agrees to maintain the immigrant at not less than 125 percent of the federal poverty guidelines. 8 U.S.C. §§ 1182(a)(4)(C), 1183a. A joint sponsor may supplement the petitioner's affidavit. 8 U.S.C. § 1183a(f)(5); 22 C.F.R. § 40.41(c).

16. The State Department's binding regulation provides that "[a]ny determination that an alien is ineligible under INA 212(a)(4) must be predicated upon circumstances indicating that, notwithstanding any affidavit of support that may have been filed on the alien's behalf, the alien is likely to become a public charge after admission." 22 C.F.R. § 40.41(a). The State Department last amended that regulation in 2023. 88 Fed. Reg. 60,582 (Sept. 5, 2023). The Department of Homeland Security's recently promulgated public-charge rule governs determinations by DHS, not by consular officers. It takes effect September 18, 2026. 91 Fed. Reg. 45, 324 (July 20, 2026).

**C. The Provisional Unlawful Presence Waiver**

17. A noncitizen who accrues one year or more of unlawful presence in the United States and then departs is inadmissible for ten years. 8 U.S.C. § 1182(a)(9)(B)(i)(II). The immediate relative of a United States citizen may apply to USCIS, before departing, for a provisional waiver of that ground. 8 C.F.R. § 212.7(e).

18. An approved provisional waiver does not take effect until the applicant (1) departs the United States, (2) appears for his immigrant visa interview, and (3) receives a consular officer's determination that, considering the waiver, he is otherwise eligible for an immigrant visa. 8 C.F.R. § 212.7(e)(12). Until the interview occurs, the applicant remains outside the United States and subject to the ten-year bar. He has no lawful means of returning to his family other than the immigrant visa for which he departed. The regulation automatically revokes the waiver approval

in specified circumstances, including termination of the applicant's immigrant visa registration. 8 C.F.R. § 212.7(e)(14).

**D. The Administrative Procedure Act**

19. The APA requires that, "within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b). A reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1). Pending review, the court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights." 5 U.S.C. § 705.

## FACTUAL ALLEGATIONS

**A. Mauricio, Annita, and Their Family**

20. Mauricio was born in Usulután, El Salvador, in 1986. He came to the United States in January 2004 at age seventeen. He lived in the Chicago area continuously for more than twenty-two years, until he departed for his consular interview on August 11, 2026.

21. Mauricio and Annita married on April 13, 2013, in Chicago, Cook County, Illinois. (Exhibit A.)

22. Mauricio and Annita have one child, S.R., a United States citizen born in Chicago in 2016. A school psychologist for the Bellwood, Illinois school district diagnosed S.R. with autism. S.R. receives special-education services through the Proviso Area for Exceptional Children. S.R. depends on both of his parents for daily care and routine.

23. Mauricio and Annita own and operate Top Quality Auto Repair at 1542 North Mannheim Road, Stone Park, Illinois 60165, on property they purchased. Mauricio is the business's owner and principal automotive mechanic.

**B. The I-130 Petition, the Provisional Waiver, and NVC Processing**

24. Annita filed a Form I-130 (Petition for Alien Relative) for Mauricio as her husband on October 30, 2015. USCIS approved the petition on April 17, 2017, and forwarded it to the NVC. The NVC assigned Case No. SNS2017623011. (Exhibit B.)

25. The Chicago Immigration Court administratively closed Mauricio's removal proceedings in 2014. In October 2025, the Immigration Judge denied the Department of Homeland Security's motion to recalendar those proceedings.

26. On October 17, 2022, Mauricio filed Form I-601A, Application for Provisional Unlawful Presence Waiver, with extensive evidence of the extreme hardship that his absence would cause Annita. USCIS approved the waiver on May 23, 2025 (Receipt No. LIN2390016370). (Exhibit C.) The approval notice states that the waiver "will not take effect until" Mauricio has left the United States, has "appeared at a U.S. Embassy or Consulate for an interview in connection with [his] application for an immigrant visa," and has received a consular officer's determination that he is otherwise eligible. (*Id.*)

27. Mauricio submitted his Form DS-260, Immigrant Visa Application, on November 21, 2025. Annita submitted a Form I-864, Affidavit of Support, as petitioner concurrently. A qualifying joint sponsor submitted a second Form I-864. They also submitted the required tax returns, W-2s, and civil documents. On December 19, 2025, the NVC notified Mauricio, Annita, and their counsel that it had "received all of the fees, forms, and documents that are required prior to scheduling your immigrant visa interview" and that it would "work with the U.S. Embassy/Consulate General in SAN SALVADOR… to schedule an interview appointment." (Exhibit D.)

28. On June 10, 2026, the NVC notified Mauricio, Annita, and their counsel that it had "finished processing your immigrant visa case and scheduled your visa interview" for August 12, 2026, at 8:30 a.m., at the U.S. Embassy in San Salvador, in visa category IR1 (Spouse of United States Citizen). (Exhibit E.)

**C. Mauricio's Departure and the Interview Defendants Scheduled**

29. An approved provisional waiver takes effect only after departure. USCIS also warned that leaving while removal proceedings remained pending could lead to automatic revocation of the waiver. In June 2026, Mauricio therefore filed a motion with the Immigration Court to recalendar and dismiss his administratively closed proceedings before his interview. On August 11, 2026, the Immigration Judge instead granted Mauricio pre-conclusion voluntary departure under INA § 240B(a). The order requires him to depart the United States on or before September 10, 2026. Both parties waived appeal, and the order is final. (Exhibit F.)

30. Mauricio departed the United States for El Salvador the same day, August 11, 2026. He complied with the voluntary departure order, and he relied on the interview appointment that the State Department had scheduled for the following morning. (Rivera Castillo Decl. ¶ 5.) He has remained in El Salvador since that day. Since arriving, he has gone to the U.S. Embassy three times to confirm his voluntary departure with U.S. authorities, and each time the Embassy has refused to let him in. (*Id.*) His departure triggered the ten-year bar of 8 U.S.C. § 1182(a)(9)(B)(i)(II). His approved provisional waiver will cure that bar only if and when a consular officer interviews him and finds him otherwise eligible.

31. The Embassy in San Salvador requires immigrant visa applicants to make two visits. The first visit (without an appointment) is for "Document Review & Biometrics" on the afternoon of the applicant's medical examination. The second visit is for the interview itself.

(Exhibit I.) Mauricio could not leave the United States until the Immigration Judge ruled on August 11. He therefore could not complete his panel-physician medical examination or the Embassy's document review before his August 12 appointment, and the Embassy did not interview him that day. Mauricio completed his medical examination with the Embassy's designated panel physician just days later. (Rivera Castillo Decl. ¶ 7.) The Embassy rescheduled his interview for September 16, 2026, at 7:30 a.m. The State Department's official appointment system for El Salvador listed his "Current Status" as "Attend Appointment" and his "Consular Appointment" as "16 September, 2026, 07:30 Nuevo Cuscatlan local time at San Salvador." (Exhibit H.)

32. At the Embassy's request, Mauricio and Annita gathered and submitted additional evidence of their marriage. Counsel uploaded updated marriage evidence, the I-601A approval notice, and an updated police certificate to the Consular Electronic Application Center. Mauricio and Annita also amended their federal income tax returns for 2023 through 2025 and brought the amended returns to El Salvador for the interview. Mauricio was ready to attend his interview on September 16, 2026, with every required document in hand, and he remains ready today.

**D. The 75-Country Policy, Its Vacatur, and the Worldwide Pause**

33. On January 14, 2026, the Secretary of State transmitted a cable to all diplomatic and consular posts. The cable directed that, effective January 21, 2026, consular officers "must refuse" immigrant visas under INA § 221(g) to nationals of 75 designated countries (the "75-Country Policy"). The stated theory was that those nationals were at "high risk" of becoming a public charge. El Salvador was not among the 75 countries. (Exhibit J, *CLINIC* Op. at 8 n.1; Exhibit O-1.) The cable expressly instructed that "interview appointments for applicants from these nationalities should not be cancelled" and that "[c]onsular officers should continue to adjudicate all immigrant visa cases." (Exhibit J, *CLINIC* Op. at 9.)

34. Federal courts, including this Court, found the 75-Country Policy unlawful. On May 18, 2026, Judge Rowland granted a temporary restraining order that required Defendants to adjudicate a Chicago resident's immigrant visa application without regard to the Policy. Judge Rowland held that the doctrine of consular nonreviewability did not apply because the Department ("not any consular official") made the decision. She held that the Policy was final agency action, that it was likely arbitrary and capricious, and that it likely exceeded the Secretary's authority under 8 U.S.C. § 1104(a). *Leon Morales v. Rubio*, No. 1:26-cv-02893, ECF No. 47 (N.D. Ill. May 18, 2026). (Exhibit P.) The Department adjudicated the application and issued the visa within nine days. *Id.*, ECF No. 48 (May 27, 2026). (*Id.*)

35. On August 21, 2026, the Southern District of New York held that the 75-Country Policy violated the bar on nationality discrimination in 8 U.S.C. § 1152(a)(1)(A). *CLINIC*, ECF No. 83 at 34–37. It held that the Policy violated 8 U.S.C. § 1201(g) and 22 C.F.R. § 40.6 because it "displace[d] consular officers from the role Congress assigned them in the visa issuance process, to make the final determination as to whether to refuse or grant immigrant visas to applicants in accordance with the INA and its implementing regulations." *Id.* at 38–42. And it held that the Policy exceeded the Secretary's authority under 8 U.S.C. § 1104(a). *Id.* at 42–44. The court vacated the Policy and every refusal based solely upon it. It entered partial final judgment on August 24, 2026. *Id.*, ECF No. 84. (Exhibit J.)

36. The State Department responded immediately. On August 24, 2026, the first business day after the *CLINIC* decision, embassies and consulates around the world began cancelling scheduled immigrant visa interview appointments. They sent applicants form emails stating that their appointments had been "rescheduled," without new dates. The cancellations reached nationals of countries outside the 75 and posts that do not serve those nationals. (Exhibits

G, O-2, Q.) On information and belief, the cancellations followed instructions from Washington. According to a later Reuters report citing persons with knowledge of the situation, "the state department called missions around the world and told them to cancel immigrant visa appointments." Humeyra Pamuk et al., *US resumes immigrant visa processing for Hungary, Poland as pause remains elsewhere*, Reuters (Sept. 8, 2026).

37. On August 25, 2026, according to Reuters, a State Department spokesperson acknowledged that the Department had "launched a global training initiative at all U.S. embassies and consulates worldwide and that appointments for visa services will be adjusted to accommodate the training." The Department said the training aimed to help consular officers "screen out applicants deemed likely to become dependent on U.S. public benefits," but it "did not specify details on the training and its timeline." Kanishka Singh, *Trump administration issues pause on immigrant visa appointments for applicants worldwide*, Reuters (Aug. 25, 2026). The Department's own public guidance says nothing about any of this. Its travel.state.gov page on immigrant visa processing, last updated August 28, 2026, states that the 75-country pause "is no longer in effect" as of August 21, 2026, and that "[t]he Department of State is undergoing a full review of all screening and vetting policies." Under the heading "What happens to my immigrant visa interview appointment?," the page answers that applicants "may submit visa applications and attend interviews, and the Department will continue to schedule visa interviews." The page does not mention any suspension of interviews, any rescheduling, or any training initiative. (Exhibit O-1.)

38. On August 27, 2026, the Associated Press reported that, according to a State Department official, the Pause "is not expected to last beyond early to mid-September," that "most people affected by the pause had interviews scheduled for August," and that "[t]hose interviews

will be rescheduled for September, October and November." Associated Press, *Trump administration pauses all immigrant visa applications amid new screening policy* (Aug. 27, 2026).

39. In a filing in *CLINIC* on August 28, 2026, Defendants represented that "[t]o allow time for appropriate coordination on guidance to implement the Court's order and to account for updated procedures in applying the public-charge ground of inadmissibility… the Bureau of Consular Affairs is rescheduling immigrant-visa appointments." *CLINIC*, ECF No. 90 at 3; *id.*, ECF No. 90-1 (Decl. of John Armstrong) ¶ 7. (Exhibit K.)

40. On August 31, 2026, the *CLINIC* court granted in part the plaintiffs' emergency motion to enforce its judgment and ordered Defendants to file a sworn status report. The plaintiffs' later filing quotes the hearing transcript. According to that filing, the court stated that requiring already-vetted applicants to undergo a renewed public-charge analysis "would be very contrary to the import of [this Court's] order" and "would be grossly inequitable." When the court asked whether the Department was going to "do another public charge analysis," Defendants' counsel answered, "No, your Honor, I'm not saying that." *CLINIC*, ECF No. 97 at 1, 4 (quoting Tr. 21:22–25, 34:3–9). (Exhibit N.)

41. On September 8, 2026, Defendants filed a status report supported by a second sworn declaration of John Armstrong, Principal Deputy Assistant Secretary in the Bureau of Consular Affairs. *CLINIC*, ECF Nos. 96, 96-1 ("Armstrong Decl."). (Exhibit L.) Mr. Armstrong attested that:

> (a) "to account for updated procedures for consular officers applying the public charge ground of inadmissibility — the Department rescheduled immigrant visa appointments globally through August 31, 2026," and "has since undertaken additional rescheduling of immigrant visa appointments globally through September 2026" (Armstrong Decl. ¶ 5);

> (b) "[t]o accommodate a global training initiative, the Department has rescheduled many immigrant visa appointments originally scheduled through September 2026," and "[t]here is no fixed date" for completion (*id.* ¶ 12);
>
> (c) a new "public charge worksheet that informs the officer's assessment of public charge inadmissibility" was "deployed to consular officers for use globally pursuant to guidance issued on August 15, 2026" (*id.* ¶ 15); and
>
> (d) the Bureau of Consular Affairs "formally deployed" "four new training requirements" on September 1, 2026, including "expanded managerial review of consular officer adjudications and mandated training on conducting the public charge analysis required by Department guidance," which "apply to all immigrant visa adjudications globally, and not just cases remanded under the Court's Order" (*id.* ¶¶ 16–17).

42. The Department has not published the worksheet, the August 15, 2026 guidance, or the September 1, 2026 training requirements in the Federal Register. It has not adopted any of them through notice-and-comment rulemaking. The Department has not amended 22 C.F.R. § 40.41 since 2023.

43. On September 8, 2026, Reuters reported that the Department had resumed processing immigrant visa applications at its posts in Hungary and Poland at the direction of the White House while maintaining the pause elsewhere. As the Times of India reported two days later, citing Reuters, "the White House directed US missions in Hungary and Poland to prioritise immigrant visa processing," and "[t]he US government has not publicly explained why the two countries were singled out." The same report explained that after the *CLINIC* decision the Department "introduced a new training programme for consular officers" and "then temporarily paused immigrant visa interviews globally while officers were trained under the new system," that "[t]he State Department has not said when the wider processing disruption will end," and that

"[t]he training requirements could keep some missions affected for months because officers must complete self-training and then receive certification." (Exhibit O-2.)

44. Immigration attorneys practicing in the Chicago area report the same pattern from the ground. Between September 2 and September 10, 2026, attorneys posted messages to the members' listserv of the Chicago Chapter of the American Immigration Lawyers Association. (Exhibit Q.) They reported that their clients received generic cancellation emails from donotreply@usvisa-info.com, in several languages, with no case number or case-specific information, while the Department's appointment system continued to show the appointments as scheduled. They reported that the Department was "not sending notifications to attorneys." They reported that clients who had already left the United States for interviews in Ciudad Juárez were stuck in Mexico after cancellations that arrived one to four days before the interview. One client who went to the consulate in person on August 27 learned "that no IV appointments are going forward," that he would receive an e-mail with a new date, and that there were "no instructions on a time frame, just that everyone had to wait." Posts cancelled interviews scheduled as late as September 19 (Bogotá) and September 29 (Ciudad Juárez). During the same period, the National Visa Center was scheduling immigrant visa interviews at the U.S. Embassy in Warsaw on days' notice, including for applicants who were not documentarily qualified or had not paid their visa fees. Applicants who traveled to Poland "were all interviewed." As of September 10, 2026, "[t]he interviews are going forward, and they are approving the visas," and "[s]everal" clients had "picked up their passports with visas this week and last week." (*Id.*)

45. On September 10, 2026, Defendants noticed an appeal from the *CLINIC* judgment. *CLINIC*, ECF No. 98; No. 26-2573 (2d Cir.). On September 14, 2026, Defendants moved to stay the judgment pending appeal. *CLINIC*, ECF Nos. 100, 101. (Exhibit M.) In that motion,

Defendants asserted that "[t]he Secretary had statutory authority to direct the non-issuance of visas in the foreign policy interests of the United States and to not admit aliens on visas who may become public charges until the Department can implement improved procedures to evaluate those aliens." *Id.*, ECF No. 101 at 6. Defendants also asserted that "absent a stay, some remanded applications may proceed to visa issuance and admission before the Department completes the updated public-charge training and adjudication tools described above, including applications that otherwise would have resulted in findings of public-charge ineligibility." *Id.* at 8–9. Defendants described the "global training initiative for consular sections" as undertaken "[i]ndependently of the vacated Policy." *Id.* at 3.

46. Defendants have never published the directive that implements the Pause. Their own public guidance, current as of August 28, 2026, does not mention it and tells applicants that they may "attend interviews" and that "the Department will continue to schedule visa interviews." (Exhibit O-1.) They have never explained why training consular officers requires suspending interviews worldwide rather than training officers in shifts, nor have they never explained why they cannot exempt posts and cases that the new procedures do not affect, or applicants who have already departed the United States. They have never set an end date and have not accounted for applicants who, like Mauricio, departed the United States in reliance on scheduled appointments and who cannot return until a consular officer interviews them. The Pause remains in effect at the U.S. Embassy in San Salvador as of the filing of this Complaint.

**E. Application of the Pause to Mauricio**

47. On the afternoon of Sunday, August 30, 2026 (2:03 p.m. as displayed in his mailbox), Mauricio received an e-mail from "The Visa Information Service" <donotreply@usvisa-info.com>. That is the contractor-operated appointment service through which the State

Department schedules immigrant visa interviews. The e-mail did not address him by name and did not identify his case. Under the heading "IMPORTANT INFORMATION," it stated (in the automatic English translation displayed in his mailbox): "Dear Applicant, Your Immigrant Visa appointment has been rescheduled. You will receive email confirmation of your new appointment date and time. Please do not appear at the consular section until directed to do so with a rescheduled appointment. We apologize in advance for any inconvenience that this may cause. Sincerely The GDIT Visa Appointment and Information Service Team." (Exhibit G.)

48. The e-mail gave no new date. No "email confirmation of [a] new appointment date and time" has ever followed. Neither Mauricio nor his counsel received any other notice. The State Department's own official appointment system never reflected any change. On September 11, 2026, the account page for his case listed his "Consular Appointment" as "16 September, 2026, 07:30 Nuevo Cuscatlan local time at San Salvador." It still listed that appointment on September 16, 2026, even after the Embassy had turned Mauricio away. (Exhibit H.)

49. On the morning of Wednesday, September 16, 2026, Mauricio appeared at the U.S. Embassy in San Salvador for his 7:30 a.m. interview. He brought his passport, medical examination results, police certificates, civil documents, financial evidence, and amended tax returns. Embassy personnel refused to admit him for his interview, telling him to call his lawyer and nothing else. They gave him no new interview date. (Rivera Castillo Decl. ¶ 9.) The Embassy turned him away even though the Department's own appointment system still showed his appointment as scheduled that same day. (Exhibit H.)

50. No consular officer has interviewed Mauricio, executed his application, refused it, or made any finding that he is ineligible for an immigrant visa on any ground. His application

remains documentarily qualified and ready for adjudication. But for the Pause, the Embassy would have interviewed him on September 16, 2026.

51. On information and belief, absent relief from this Court, the Embassy will not interview Mauricio or adjudicate his application for an indefinite period. It will reschedule his interview, if at all, only after the Department completes its "global training initiative" and deploys its new public-charge "adjudication tools." The Department itself says it cannot fix that date.

**F. Irreparable Harm**

52. Because of the Pause, Mauricio remains stranded in El Salvador with no lawful means of returning to his home, his business, and his family. His provisional waiver will take effect only when a consular officer interviews him. 8 C.F.R. § 212.7(e)(12). He departed under a court order, so he cannot undo the trip. He accrued more than a year of unlawful presence before departing, so he is inadmissible for ten years unless and until the waiver takes effect. He cannot even get into the Embassy to confirm his compliance with the voluntary departure order. The Embassy has turned him away three times when he tried. (Rivera Castillo Decl. ¶ 5.)

53. Annita followed Mauricio to El Salvador on August 12, 2026, to be with him for the interview that the government scheduled. She has made one trip back to the United States since then, and she has returned to El Salvador, where she is now. Annita cannot remain in El Salvador indefinitely. The family's home and business are in Illinois, and so are S.R.'s school and services. Every week that the Pause continues forces the family to keep S.R. apart from one parent or the other.

54. Mauricio's absence deprives the family's business of its owner and principal mechanic. It threatens the household income on which the family depends and on which Annita's

Affidavit of Support rests. The APA does not allow money damages against Defendants. 5 U.S.C. § 702.

55. Mauricio's case depends on time-limited documents, including his panel-physician medical examination, police certificates, and current financial evidence. The longer Defendants apply the Pause to him, the greater the risk that these documents expire before his interview and that he must obtain them again at significant cost and further delay. There is also a growing risk that Defendants treat his immigrant visa registration as abandoned, which would automatically revoke his waiver, 8 C.F.R. § 212.7(e)(14), for a "failure" to appear that Defendants themselves caused.

## CLAIMS FOR RELIEF

### COUNT I

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C): Agency Action Contrary to Law and in Excess of Statutory Authority

56. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

57. The Pause is final agency action. It marks the consummation of the State Department's decision-making on whether immigrant visa interviews will go forward during its "global training initiative." Legal consequences flow from it. Posts cancel scheduled appointments, including Mauricio's. Posts turn away applicants who appear for their appointments. Posts suspend adjudication of complete, documentarily qualified applications indefinitely. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The State Department describes the Pause as temporary, but that does not make it tentative. The Pause has been in effect since August 24, 2026. The Department has extended it twice. It remains in effect "until" an undisclosed date that the agency alone controls.

58. The INA requires that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b). The State Department's regulations require every applicant to appear before a consular officer for an interview. 22 C.F.R. § 42.62. They require the consular officer to issue or refuse a properly executed application. 22 C.F.R. § 42.81(a). No statute or regulation authorizes the Secretary to suspend the adjudication of immigrant visa applications worldwide for an indefinite period while the Department develops new substantive standards and trains officers on them.

59. The Secretary has directed consular posts not to interview or adjudicate documentarily qualified applicants (including applicants who are physically present at the post for the appointment that the Department itself scheduled). By doing so, the Secretary has taken control of "the powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas," which Congress withheld from him. 8 U.S.C. § 1104(a). The Secretary may administer consular functions and may direct officers to decide applications within a reasonable time. That authority does not include authority to direct officers not to decide applications at all.

60. The Pause is therefore contrary to law and exceeds statutory authority. The Court should hold it unlawful and set it aside as applied to Mauricio's immigrant visa application. 5 U.S.C. § 706(2)(A), (C).

**COUNT II**

**Administrative Procedure Act, 5 U.S.C. § 706(2)(A): Arbitrary and Capricious Agency Action**

61. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

62. Agency action is arbitrary and capricious when the agency has failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," has "entirely failed to consider an important aspect of the problem," or has

offered an explanation that "runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

63. The State Department adopted the Pause without any contemporaneous explanation. It has not explained why training consular officers requires cancelling interviews worldwide rather than training officers in shifts. It has not explained why posts and applicants whom the new procedures do not affect cannot proceed. It has not explained why it could resume immigrant visa processing in Hungary and Poland at the direction of the White House (and could conduct immigrant visa interviews and issue immigrant visas in Warsaw throughout the Pause) while it continues to turn away applicants in San Salvador. It has offered no end date. It has contradicted its own public representation that the Pause would not extend beyond early to mid-September 2026. And its own public guidance, current as of August 28, 2026, tells applicants that they may "attend interviews" and that "the Department will continue to schedule visa interviews." (Exhibit O-1.)

64. The State Department entirely failed to consider the serious reliance interests of applicants who had already departed the United States to attend scheduled interviews. Those applicants include people who departed under voluntary departure orders, triggered the ten-year bar on departure, and cannot return until a consular officer interviews them. See *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016).

65. The Pause departs from the State Department's own instruction in January 2026 that interview appointments "should not be cancelled" and that consular officers "should continue to adjudicate all immigrant visa cases" while the Department reviewed its public-charge

procedures. The Department has neither acknowledged nor explained that departure. See *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

66. The timing and sweep of the Pause indicate that the stated "training" rationale is not the genuine justification for the action. The Pause began on the first business day after a federal court vacated the 75-Country Policy. The State Department itself has tied the Pause to that vacatur and to new public-charge procedures. The Department has defended the Pause as a means of preventing applicants from "proceed[ing] to visa issuance and admission" before its new public-charge tools are in place. See *Dep't of Commerce v. New York*, 588 U.S. 752, 781–85 (2019).

67. The Pause is arbitrary and capricious. The Court should hold it unlawful and set it aside as applied to Mauricio's immigrant visa application. 5 U.S.C. § 706(2)(A).

**COUNT III**

**Administrative Procedure Act, 5 U.S.C. §§ 555(b), 706(1): Agency Action Unlawfully Withheld and Unreasonably Delayed**

68. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

69. Defendants have a discrete, non-discretionary duty to permit Mauricio to appear before a consular officer for an interview and to review and adjudicate his immigrant visa application. 8 U.S.C. § 1202(b); 22 C.F.R. §§ 42.62, 42.81(a). They have a duty to conclude that matter within a reasonable time. 5 U.S.C. § 555(b). See *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

70. Defendants have unlawfully withheld that action. The NVC found Mauricio's case documentarily qualified on December 19, 2025. The State Department scheduled his interview for August 12, 2026, and then for September 16, 2026. Defendants then refused, under the Pause, to let him appear. This is not delay attributable to a queue, to resource constraints, or to any

circumstance of Mauricio's case. It is a categorical refusal to act under an unlawful policy for reasons that have nothing to do with him.

71. The withholding is also unreasonable under the factors set out in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984). No rule of reason governs an open-ended, worldwide halt with "no fixed date." Human health and welfare are at stake, including the welfare of a United States citizen child with a disability. Compelling Defendants to honor an appointment they already assigned would not advance Mauricio ahead of any other applicant or reorder any queue. The interests prejudiced are severe.

72. The Court should compel Defendants to interview Mauricio and adjudicate his immigrant visa application without further delay. 5 U.S.C. § 706(1).

## COUNT IV

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D), and the *Accardi* Doctrine: Failure to Follow Binding Regulations

73. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

74. An agency must follow its own binding regulations. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Zelaya Diaz v. Rosen*, 986 F.3d 687, 690 (7th Cir. 2021).

75. Under 22 C.F.R. § 40.41(a), a public-charge ineligibility finding "must be predicated upon circumstances indicating that, notwithstanding any affidavit of support that may have been filed on the alien's behalf, the alien is likely to become a public charge after admission." Under 8 U.S.C. § 1182(a)(4)(B), the consular officer must consider the applicant's individual age, health, family status, assets, resources, financial status, education, and skills. The officer may also consider the affidavit of support.

76. Defendants have stated that consular officers will adjudicate every immigrant visa application, including Mauricio's, under a public-charge "worksheet," guidance issued on August 15, 2026, and training requirements deployed on September 1, 2026. Defendants have not published any of those materials or subjected them to notice and comment. Those materials may establish binding standards that depart from 22 C.F.R. § 40.41 and 8 U.S.C. § 1182(a)(4), or they may treat the Department of Homeland Security's rule, 91 Fed. Reg. 45,324 (July 20, 2026), as governing consular determinations. To that extent, they effectively amend a legislative rule without the procedure that the APA requires. 5 U.S.C. § 553.

77. Plaintiffs are entitled to a declaration that any public-charge determination in Mauricio's case must be individualized, must comply with 8 U.S.C. § 1182(a)(4) and 22 C.F.R. § 40.41, and must consider the Affidavits of Support on file. Plaintiffs are also entitled to an injunction requiring Defendants to follow those requirements. 5 U.S.C. § 706(2)(A), (D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Declare that the Pause, as applied to Plaintiff Mauricio Antonio Rivera Castillo, is contrary to law, in excess of statutory authority, and arbitrary and capricious. Declare that Defendants have unlawfully withheld and unreasonably delayed adjudication of his immigrant visa application.

(b) Issue a temporary restraining order and preliminary injunction as set forth in Plaintiffs' simultaneously filed Emergency Motion. That order should enjoin Defendants from applying the Pause to Mauricio's immigrant visa application (NVC Case No. SNS2017623011, A# 097-735-937). It should require Defendants

to interview him at the U.S. Embassy in San Salvador within seven (7) days and to adjudicate his application within fourteen (14) days after the interview.

(c) Permanently enjoin Defendants from applying the Pause (or any substantially similar suspension of interviews or adjudication) to Mauricio's immigrant visa application. Order Defendants to adjudicate that application in accordance with 8 U.S.C. §§ 1182, 1201, and 1202 and 22 C.F.R. §§ 40.6, 40.41, 42.62, and 42.81.

(d) Declare that any public-charge determination in Mauricio's case must be individualized, must comply with 8 U.S.C. § 1182(a)(4) and 22 C.F.R. § 40.41, and must consider the Affidavits of Support on file.

(e) Enjoin Defendants from penalizing Mauricio for any delay that the Pause caused. Specifically, enjoin Defendants from terminating his immigrant visa registration under INA § 203(g), 8 U.S.C. § 1153(g), from treating his provisional waiver as revoked under 8 C.F.R. § 212.7(e)(14), and from treating him as having failed to appear for or to pursue his application.

(f) Award Plaintiffs their costs and reasonable attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

(g) Grant such other and further relief as the Court deems just and proper.

Dated: September 17, 2026

Respectfully submitted,

***/s/ William Gaston McLean III***
WILLIAM GASTON MCLEAN III
Law Office of William Gaston McLean III, P.C.
318 W. Adams St., #1517
Chicago, IL 60606
Ph: (312) 714-5603
Fax: (312) 268-7427
Email: mcleanlaw.chicago@gmail.com
ARDC No. 6306574
Attorney for Plaintiffs

## VERIFICATION

I, Annita Rivera, am a Plaintiff in this action. I have read the foregoing Verified Complaint. The factual statements in it concerning me, my family, and my husband's immigrant visa case are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746. Executed on September 17, 2026 in San Salvador, El Salvador.

***/s/ Annita Rivera***
Annita Rivera

I, Mauricio Antonio Rivera Castillo, am a Plaintiff in this action. I have read the foregoing Verified Complaint. The factual statements in it concerning me, my family, and my husband's immigrant visa case are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746. Executed on September 17, 2026 in San Salvador, El Salvador.

***/s/ Mauricio Antonio Rivera Castillo***
Mauricio Antonio Rivera Castillo

**CERTIFICATE OF SERVICE**

I, William Gaston McLean III, an attorney, certify that on September 18, 2026, I filed the foregoing Plaintiffs' Verified Complaint for Declaratory and Injunctive Relief electronically with the Clerk of the Court through the CM/ECF system. No attorney has yet appeared for Defendants. On the same date, I emailed a copy of the foregoing to attorneys Joshua Press and Craig Oswald, and paralegal Catherine Manahan, with the Civil Division of the United States Attorney's Office for the Northern District of Illinois, 219 South Dearborn Street, 5th Floor, Chicago, Illinois 60604, at joshua.press@usdoj.gov, craig.oswald@usdoj.gov, and catherine.manahan@usdoj.gov. I am also serving the Summons and Complaint under Federal Rule of Civil Procedure 4(i).

***/s/ William Gaston McLean III***
William Gaston McLean III